[Cite as *In re B.B.*, 2012-Ohio-2695.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## DEFIANCE COUNTY

IN THE MATTER OF:

    B. B. nka D. G. C., III,

CASE NO.  4-10-17

A DEPENDENT CHILD,

    [JAMIE W. - APPELLANT].

**O P I N I O N**

Appeal from Defiance County Common Pleas Court
Juvenile Division
Trial Court No. 29941

**Judgment Affirmed**

**Date of Decision:   June 18, 2012**

APPEARANCES:

    *Timothy C. Holtsberry*  for Appellant

    *Russell R. Herman*  for Appellee

**SHAW, J**.

{¶1} Respondent-appellant, Jamie W. ("Jamie"), appeals the November 4, 2010 judgment of the Defiance County Court of Common Pleas, Juvenile Division, adjudicating her child dependent and granting temporary custody of her child to the Defiance County Department of Job and Family Services (the "Agency").

{¶2} On February 3, 2010, Jamie gave birth to B.B. nka D.G.C. III ("D.G.C.") via a scheduled cesarean section at the Defiance County Regional Medical Center. The parties stipulated that D.G.C. was born healthy and drug-free. D.G.C. is Jaime's fifth child.

{¶3} Upon receiving confirmation of D.G.C.'s birth, the Agency sought emergency temporary custody of D.G.C. The Agency's request for emergency custody was predicated on a phone call it received the day before from D.G.C.'s putative father, Daniel C. ("Daniel"). Daniel informed the Agency that Jamie was scheduled to give birth to his child the next day. Daniel explained that, a few days prior, Jamie abruptly left his house after an argument and that he was unaware of her current location. Daniel expressed concern to the Agency about Jamie's ability to parent and properly care for his child. Specifically, Daniel stated that Jamie had three children previously removed from her custody by Children Services Agencies due to neglect and that, while she was residing with him, he

observed her neglect her dog by leaving it locked in the closet when she was tired of attending to it. He also alleged that Jamie was illegally selling her prescription drugs and that she planned to leave the state and move to the southern part of the country.

{¶4} The Agency reviewed its files on Jamie and confirmed that it had a prior history with Jamie resulting in the termination of her parental rights to her first and second child. The Agency also entered Daniel's address into its database, which revealed that a child had been recently removed from that residence due to neglect concerns and the poor condition of the environment. In particular, the house was extremely dirty and the child had contracted scabies. About an hour after the Agency received the call from Daniel, it received another call from the Williams County Department of Job and Family Services explaining that it had also removed Jamie's fourth child from her custody and that it had just received a phone call expressing similar concerns about Jamie's unborn child.

{¶5} On February 3, 2010, the trial court issued an ex-parte order granting the Agency emergency temporary custody of D.G.C. based on the Agency's representations that D.G.C. was in immediate need of protection and services for the preservation of his health and safety, and that there had been insufficient time to locate and verify possible alternative placements.

{¶6} The next day, on February 4, 2010, the trial court held a hearing regarding D.G.C.'s emergency placement with the Agency. Present at the hearing were Daniel and Sandra Ransey, a representative of the Agency. Notably, Jamie was not present at this hearing because she was still hospitalized at the time. Based on the testimony presented, the trial court ordered the Agency to continue to have emergency temporary custody of D.G.C. until further ordered by the court.

{¶7} On March 19, 2010, Daniel was legally determined to be D.G.C.'s biological father.

{¶8} On March 22, 2010, the Agency filed a complaint alleging D.G.C. to be dependent because his "condition or environment is such as to warrant the State, in the interests of the child, in assuming his guardianship." The complaint specified that Jamie has had two previous children removed and placed in the permanent custody of the Agency and that she has had one other child removed by the Williams County Department of Job and Family Services. In addition, the complaint indicated that Daniel currently lived with his ex-wife along with a registered sex offender, from whom Daniel received his sole source of income as the result being this individual's "caretaker." The complaint described Daniel's home as housing many animals and having a foul order. Based on these facts, the Agency alleged D.G.C. to be a dependent child pursuant to R.C. 2151.04(C) and requested temporary custody of D.G.C.

{¶9} On April 13, 2010, the trial court ordered D.G.C. to remain in the Agency's temporary custody noting Jamie's own recommendation that D.G.C. remain in the Agency's temporary custody due to the Agency's concern with the condition of Daniel's home. The trial court also appointed a Guardian Ad-Litem ("GAL") to the case.

{¶10} On May 25, 2010, Jamie filed a motion to dismiss alleging Defiance County to be the improper venue for the case because she was a resident of Paulding County at the time the complaint was filed. Jaime also disputed that any alleged abuse, neglect or dependency occurred in Defiance County since D.G.C. was removed from her care immediately after being born. The trial court subsequently held a hearing on Jamie's motion to dismiss, overruled the motion on the record, and journalized its decision in its July 26, 2010 Judgment Entry.

{¶11} On August 31, 2010, Jamie filed a motion in limine seeking to exclude from evidence any reference to the dependency cases involving her previous children on the grounds that such evidence is irrelevant because the present case only involves allegations concerning the adequacy of D.G.C.'s condition and environment at the time of the complaint. Jamie also argued that evidence of her children's prior dependencies violated Evid. R. 404(B) as improper character evidence and that R.C. 3107.15 precluded any evidence of these children and their adjudications as dependent from being presented in this

case because the children have since been adopted and no longer have a legal relationship to Jamie or D.G.C.

{¶12} On September 2, 2010, the case proceeded to adjudication. At the beginning of the proceedings, the trial court considered and overruled Jamie's motion in limine. Jamie made an ongoing objection on the record to the Agency presenting evidence of the prior dependencies of Jamie's children.

{¶13} At the adjudication proceedings, the Agency presented the testimony of the caseworkers at the Agency who handled D.G.C.'s case. The Agency also offered the testimony of law enforcement members who had contact with Daniel and Jamie during the time alleged in the complaint. Daniel and Jamie each testified on their own behalves. At the close of the evidence, the trial court made its findings of fact and conclusions of law on the record. Based on the evidence presented, the trial court determined that the Agency had met its burden in proving by clear and convincing evidence that D.G.C. is a dependent child and ordered him to remain in the Agency's temporary custody pending disposition of the case.

{¶14} On September 21, 2010, the GAL filed her report on this case recommending that it is in D.G.C.'s best interest to remain in the Agency's temporary custody to allow Daniel and Jamie time to improve their current situations in order to be able to provide D.G.C. with an appropriate environment where he can begin to thrive.

{¶15} In the interim, the parties worked on developing a case plan with the primary goal being the reunification of D.G.C. with Daniel and Jamie. On November 1, 2010, the parties appeared before trial court for the disposition of the case. On the record, the parties stipulated to and agreed that it is in D.G.C.'s best interest to be placed in the temporary custody of the Agency. On November 4, 2010, the trial court found that it is D.G.C.'s best interest to be placed in the Agency's temporary custody for the period of one year or until February 3, 2011.

{¶16} Jamie now appeals, asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED IN HEARING THIS CASE IN DEFIANCE COUNTY AS PAULDING COUNTY WAS THE PROPER VENUE.**

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S DIRECTED VERDICT MOTION.**

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT'S FINDING OF DEPENDENCY WAS NOT SUPPORTED BY SUBSTANTIAL CREDIBLE EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

### ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT ERRED IN ABUSING ITS DISCRETION IN ALLOWING ADMISSION OF AND RELYING ON IRRELEVANT EVIDENCE OF PRIOR**

**DEPENDENCIES OF CHILDREN ADOPTED AWAY FROM THE APPELLANT IN CONTRADICTION OF OHIO CASE LAW, EVIDENCE RULE 404 AND R.C. 3107.15.**

**ASSIGNMENT OF ERROR NO. V**

**THE TRIAL COURT ERRED IN ABUSING ITS DISCRETION IN ALLOWING ADMISSION OF AND RELYING ON EVIDENCE OF THE CONDITION AND ENVIRONMENT OF [DANIEL C.'S] HOME.**

*The First Assignment of Error*

{¶17} In her first assignment of error, Jamie argues that the proper venue for this case was Paulding County, not Defiance County, because she was a resident of Paulding County at the time of D.G.C.'s birth and at the time the complaint was filed.

{¶18} Section 2151.27 of the Revised Code and Juvenile Rule 10(A) permit a complaint alleging that a child is dependent to be filed either where the child resides *or where the alleged dependency occurred.* In overruling Jamie's motion to dismiss, the trial court concluded the following.

> **In the case at hand, the Complaint brought by the Agency alleges the child to be a dependent child in Defiance County. Whether the Agency can prove the allegation is to be determined at trial in this matter. However, because Juvenile Rule 10(A) and Ohio Revised Code Section 2151.27(A) allow for a complaint to be filed either in the county of the child's parent's residence or in the county where the dependency occurred, Jamie's motion to dismiss based solely upon the issue of the mother's residence is without merit.**

(JE, July 26, 2010).

{¶19} Moreover, the evidence in the record does not conclusively establish that Jamie was a resident of Paulding County at the time of D.G.C.'s birth. Rather, according to her own testimony, Jamie lived in Defiance County at Daniel's residence for nine months prior to D.G.C.'s birth. Jamie abruptly left Daniel's home after an argument three days before giving birth. Jamie reported to the Defiance County Regional Medical Center to give birth to D.G.C. via a scheduled caesarian section. Jamie testified that in the three day interim she lived with her ex-husband and his family in Paulding County and continued to so at the time the complaint was filed. However, Jamie admitted this was considered to be a *temporary* living arrangement. It was not until June of 2010, months after D.G.C.'s birth and the filing of the complaint, that Jamie secured her own apartment in Paulding County.

{¶20} In addition, Juv.R. 11(A) provides, "[i]f the child resides in a county of this state and the proceeding is commenced in a court of another county, that court, on its own motion or a motion of a party, *may* transfer the proceeding to the county of the child's residence upon the filing of the complaint or after the adjudicatory or dispositional hearing for such further proceeding as required." (Emphasis Added.) See also R.C. 2151.271. Moreover, pursuant to Juv.R. 11(B)

a transfer of the case is required only if there is already a case pending in the county of the child's residence.

{¶21} In sum, the decision whether to grant a motion for a change of venue pursuant to Juv.R. 11(A) and R.C. 2151.271 is left to the sound discretion of the trial court. *In re Meyer* (1994), 98 Ohio App.3d 189, 648 N.E.2d 52. The record is clear that no case was pending in Paulding County at the time the complaint in this case was filed in Defiance County. Thus, the trial court was under no obligation to transfer the case to Paulding County. Moreover, there is nothing in the record to suggest that the trial court's decision to overrule Jamie's motion to dismiss constituted an abuse of discretion. Accordingly, Jamie's first assignment of error is overruled.

### *The Second and Third Assignments of Error*

{¶22} In her second and third assignments of error, Jamie essentially argues that the Agency failed to present sufficient evidence to prove that D.G.C. is a dependent child. Jamie also argues that the trial court's adjudication of D.G.C. as dependent was not supported by clear and convincing evidence and was against the manifest weight of the evidence.

{¶23} At the outset, we note that Jamie and Daniel stipulated to and agreed on the record that it is in D.G.C.'s best interest to be placed in the temporary

custody of the Agency. Nevertheless, Jamie now claims on appeal that the trial court erred in adjudicating D.G.C. as a dependent child.

{¶24} Prior to assessing the adequacy of the evidence before the trial court to support its finding of D.G.C. as a dependent child, we would like to address Jamie's contention regarding the nature of the complaint which underlies these assignments of error. Throughout the proceedings, Jamie essentially argues that because the Agency's complaint only makes reference to R.C. 2151.04(C), which focuses on the child's condition and environment, any evidence of prior dependencies of Jamie's other children is irrelevant to D.G.C.'s case and therefore should be precluded from the trial court's consideration.

{¶25} The section of the Revised Code under which the Agency brought its dependency action, R.C. 2151.04(C), states that a "dependent child" means any child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship."

{¶26} However, R.C. 2151.04(D) also defines a dependent child when both of the following apply:

> **(1) The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child.**

**(2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household.**

{¶27} Jamie appears to argue that these two definitions of dependency are mutually exclusive and cannot be considered in conjunction with one another. We disagree. Just because the Agency's complaint did not specifically make reference to R.C. 2151.04(D), which expressly considers the parent's conduct regarding prior dependencies, does not mean that the conduct of a parent is wholly irrelevant to a determination of any alleged dependent child complaint under R.C. 2151.04(C). Indeed, a court may consider a parent's conduct insofar as it forms part of the child's environment. *In re Alexander C*., 164 Ohio App.3d 540, 843 N.E.2d 211, 2005-Ohio-6134, ¶ 51, citing *In re Burrell* (1979), 58 Ohio St.2d 37, 39, 388 N.E.2d 738. Moreover, a parent's conduct is significant if it has an adverse impact on the child sufficient to warrant state intervention. *In re Ohm*, 4th Dist. No. 05CA1, 2005-Ohio-3500, ¶ 21, citing *In re Burrell*, 58 Ohio St.2d at 39, 388 N.E.2d 738.

{¶28} Furthermore, even though the child's present "condition or environment" is the focus of a dependency determination, "the law does not require the court to experiment with the child's welfare to see if * * * [the child] will suffer great detriment or harm." *In re Burchfield* (1988), 51 Ohio App.3d

-12-

148, 156, 555 N.E.2d 325. "[T]he child does not first have to be put into a particular environment before a court can determine that * * * [the] environment is unhealthy or unsafe." *Id*., citing *In re Campbell* (1983), 13 Ohio App.3d at 36. See *In re East* (1972), 32 Ohio Misc. 65, 288 N.E.2d 343 (stating that "a child should not have to endure the inevitable to its great detriment and harm in order to give the parent, guardian, or custodian an opportunity to prove her suitability").

{¶29} In the instant case, it is undisputed that Jamie's first, second, and fourth child were adjudicated dependent and permanently removed from her custody due to her inability to provide them proper parental care.[1] In its complaint, the Agency made specific reference to these prior dependencies in support of its allegation that D.G.C. is a dependent child under R.C. 2151.04(C). Moreover, the fact that three of Jamie's children have been the subjects of dependency actions is a significant factor that should be considered in this dependency action, especially because it places D.G.C. at a substantial risk to endure the same conditions and environment which ultimately warranted the removal of Jamie's three other children.

{¶30} Accordingly, we conclude that it was within the trial court's discretion to consider evidence of the prior adjudications of Jamie's three children

---

[1] Jamie's third child was born as issue of a previous marriage. Jamie testified that she and the child's father have a custody arrangement. There is no record of a Children's Services Agency's involvement with this child. However, Jamie gave birth to her fourth child shortly after the marriage ended. This child was removed by the Agency in Williams County and eventually adopted by another family two years later.

as dependent in making its determination as to whether the current status of D.G.C.'s condition and environment as identified in the complaint rendered him a dependent child under R.C. 2151.04(C).

**{¶31}** Next, we turn our attention to Jamie's challenge of the adequacy of the evidence relied upon by the trial court in reaching its determination that D.G.C. is a dependent child. Our review of this matter begins by noting that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic civil right.' " *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, citing *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. Thus, "a parent's right to the custody of his or her child has been deemed 'paramount' " when the parent is a suitable person. *Id*. Because a parent has a fundamental liberty interest in the custody of his or her child, this important legal right is "protected by law and, thus, comes within the purview of a 'substantial right[.]' " *In re Murray* at 157, 556 N.E.2d 1169. Based upon these principles, the Ohio Supreme Court has determined that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes* at 48, 679 N.E.2d 680. Further, we are guided by R.C. 2151.01(A), which sets out the purposes of R.C. Chapter 2151 relevant here:

> **To provide for the care, protection, and mental and physical development of children subject to Chapter 2151. of the Revised Code, whenever possible, in a family environment, separating**

**the child from the child's parents only when necessary for the child's welfare or in the interests of public safety[.]**

See *In re Riddle*, 79 Ohio St.3d 259, 262, 680 N.E.2d 1227, 1997-Ohio-391. Thus, it is within these constructs that we now examine the findings and determinations made in the lower court.

**{¶32}** A finding of dependency must be supported by clear and convincing evidence. R.C. 2151.35. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118. Further, "[i]t is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id*., citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 110 N.E. 493. In *Cross*, the Ohio Supreme Court further held:

> **Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. * * * The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. Where the evidence is in conflict, the trier of facts may**

**determine what should be accepted as the truth and what should be rejected as false.**

*Cross*, 161 Ohio St. at 477-478, 120 N.E.2d 118 (internal citations omitted).

{¶33} Once the clear and convincing standard has been met to the satisfaction of the trial court, "the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof." *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613, citing *Cross*, supra. "The determination of the [trial] court should not be overturned unless it is unsupported by clear and convincing evidence." *In re Adoption of Holcomb*, supra.

{¶34} The trial court made the following findings in determining that D.G.C. is a dependent child:

> [T]he Court finds that on or about the time alleged in the complaint the child's mother, [Jamie] did not have a permanent residence and in fact had moved in with her ex-husband in Paulding County on a temporary basis out of necessity; that [Jamie] had three (3) previous children removed from her custody by both the Defiance County Department of Job and Family Services and Williams County Department of Job and Family Services prior to the birth of this child and she had been living in [Daniel's] home with no stable income and with a sex offender residing in the home. The Court further finds that the father, [Daniel], on or about the time of the Complaint, had yet not [sic] been legally determined to be the biological father of the child, and even though his home was relatively clean, it was potentially unsafe, had unsanitary odors, he had no regular income of his own and, he was housing a sex offender.

-16-

(JE, Sept. 13, 2010).

{¶35} Our review of the record reveals that each of the findings made by the trial court was supported by clear and convincing evidence. There was evidence that Jaime was unable to maintain a stable home at the time specified in the complaint. Just three days before D.G.C. was born, Jamie abruptly left Daniel's home, where she had been living for several months. Jamie testified that she subsequently moved-in with her ex-husband, which she admitted to be another temporary housing situation. Moreover, Jamie's testimony revealed that she had an extensive history of an inability to maintain stable housing and simply floated between the residences of friends' and those of her ex-husband's family members. Jamie's testimony was corroborated with the testimony of Michelle Reinhart, the Agency caseworker assigned to D.G.C.'s case and the caseworker who was also involved in the dependency cases of Jamie's first and second child. Ms. Reinhart noted that during her previous involvement with her, Jamie struggled to provide basic life necessities for herself and was unable to maintain a stable residence and instead moved frequently from place to place. Moreover, Ms. Reinhart recalled that during the rare occurrence in which Jamie was able to maintain a home, the living conditions were unsanitary and the utilities were frequently disconnected due to nonpayment.

{¶36} The record also contains clear and convincing evidence that Jamie's first two children were adjudicated dependent and that her parental rights were permanently terminated with respect to those children. Ms. Reinhart testified that the Agency initially came into contact with Jamie because her first child was diagnosed with failure to thrive syndrome due to malnourishment and improper parental care. Jamie's first child was later adjudicated dependent, and eventually Jamie's parental rights were terminated with respect to that child because she failed to comply with the case plan or to otherwise rectify the problems which lead to the child's removal by the Agency. In particular, Ms. Reinhart testified that based on her experience with Jamie, she believed Jamie was unable to obtain the proper parenting skills to provide for a child's fundamental needs because Jamie lacked the basic nurturing skills to be able to parent.

{¶37} The record reveals that while the proceedings regarding her first child were pending final disposition, Jamie became pregnant and gave birth to a second child. The Agency became involved with her second child because the conditions which warranted the Agency's removal of Jamie's first child were still present and Jamie had made no effort to rectify them. Eventually, Jamie's parental rights with regard to her second child were terminated with permanent custody being granted to the Agency. Ms. Reinhart also testified that, two years after the final disposition terminating Jamie's parental rights with respect to her

second child, she had received information from Williams County concerning a third child of Jamie's, who was removed from Jamie's care by the Agency in that county because of similar issues.

{¶38} The complaints alleging dependency, the adjudications, dispositions, motions for permanent custody and the final dispositions granting the Agency permanent custody of Jamie's first and second child were admitted as exhibits at the adjudication hearing concerning D.G.C.

{¶39} Sandra Ransey, the Agency caseworker initially assigned to D.G.C.'s case, and Clifton Vandemark, a Sergeant with the Defiance County Sheriff's Office, together visited Daniel's home on February 3, 2010, the timeframe specified in the complaint. Both testified that there were several mobile homes scattered on the property, which were not all habitable. Ms. Ransey recalled that one of the structures looked "badly mangled," and Sgt. Vandemark described the premises as a "junkyard." Both noticed several dog pens on the property and remembered seeing eight to ten dogs, which contributed to a noticeably foul odor permeating the air of premises. However, Ms. Reinhart and Sgt. Vandemark recalled that the interior of the main mobile home where Daniel lived was relatively clean. Daniel showed them a bedroom appropriately furnished with baby furniture for D.G.C.

{¶40} Upon speaking with Daniel inside the home, Ms. Ransey and Sgt. Vandemark learned that Daniel lived there with his ex-wife, Tina, an individual named C.L. and his girlfriend. Daniel explained that he was the caretaker for C.L. and as a result was also the payee on C.L.'s monthly SSI check to manage and pay C.L.'s bills. Daniel admitted that at the time, this was his only source of income. Sgt. Vandemark recalled expressing concern to Daniel about the wood burning stove in the home which did not have any guards to prevent potential injury. Sgt. Vandemark also recognized C.L. because he had previously been involved with the prosecution of C.L. for sex offenses. Sgt. Vandemark explained his concerned to Daniel about having a newborn baby live in a home with a sex offender. The Agency also presented the complaints and adjudications of C.L. for sexual offenses, one of which was for the offense of rape. Daniel admitted that C.L. lived at the home during the timeframe referenced in the complaint, but explained that he did not know C.L. was a sex offender.

{¶41} Daniel and Jamie both testified that Jamie lived at Daniel's residence from May 2009 to January 31, 2010. The home was owned by Daniel's ex-wife, who moved back onto the premises in November of 2009 when she and Daniel reconciled. Daniel testified that tensions between his ex-wife and Jamie escalated, and that on January 31, 2010, Jamie was abruptly asked to leave the residence.

Jamie testified that other than receiving a limited amount of monthly VA benefits, she did not have any other source of income.

{¶42} After reviewing the evidence before the trial court, we find that the Agency presented sufficient evidence to support the allegation of dependency alleged in the complaint. We also find that the trial court's decision finding D.G.C. to be a dependent child was supported by clear and convincing evidence and as such was not against the manifest weight of the evidence. Moreover, as previously noted, Jamie stipulated and agreed to the ultimate disposition that it is D.G.C.'s best interest to be placed in the temporary custody of the Agency. In addition, this case is still in the temporary custody phase with the fundamental goal of the case plan being to reunify Jamie and D.G.C. Accordingly, Jamie currently has the opportunity to demonstrate that she now possesses the ability to properly provide care for D.G.C. For all these reasons, we overrule Jamie's second and third assignments of error.

*Fourth Assignment of Error*

{¶43} In her fourth assignment of error, Jamie challenges the trial court's decision to allow the Agency to present evidence of the prior dependencies of Jamie's children. Specifically, Jamie argues that this evidence is irrelevant to

D.G.C.'s case because it is improper character evidence, and it relates to children who have since been adopted and are no longer legally related to Jamie or D.G.C.

{¶44} Given our discussion in the previous assignments of error, we have already determined that the prior dependencies of Jamie's children are relevant to the consideration of D.G.C. as a dependent child under R.C. 2151.04(C). Moreover, R.C. 2151.04(D) expressly allows the trial court to consider whether the siblings of the child in question have been previously adjudicated dependent because of the parent's prior conduct. Therefore, we are not persuaded by Jamie's argument that this evidence constitutes improper character evidence.

{¶45} Jamie also cites as support for her position R.C. 3107.15, which provides that a final adoption decree serves to "terminate all legal relationships between the adopted person and the adopted person's relatives, including the adopted person's biological or other legal parents." This statute generally applies to instruments and contracts, and essentially states that once a child is adopted, he or she is no longer considered a relative of his or her biological family for inheritance purposes. Jamie provides us with no *relevant* authority to support her argument that the adoption of these children now precludes the trial court from considering evidence of their prior adjudications as dependent in a current dependency action regarding the same parent and another sibling. Again, the statute governing dependency clearly permits a trial court to consider such

evidence for the primary reason to prevent a child from being placed in the same circumstances which previously warranted the removal of the child's siblings based on the parent's prior conduct.

{¶46} Accordingly, we conclude that the trial court did not err in overruling Jamie's motion in limine to exclude evidence of the prior dependencies of Jamie's children on these grounds. Jamie's fourth assignment of error is overruled.

*The Fifth Assignment of Error*

{¶47} In her fifth assignment of error, Jamie claims that the trial court erred when it allowed the Agency to introduce evidence of the condition and environment of Daniel's home. Specifically, Jamie argues that because Daniel had not been legally determined to be D.G.C.'s father at the time specified in the complaint any evidence regarding his home should be deemed irrelevant.

{¶48} On March 19, 2010, Daniel was legally determined to be D.G.C.'s father. On March 22, 2010, the Agency filed its complaint alleging D.G.C. to be a dependent child. Daniel, as the father of D.G.C. was represented by counsel throughout the dependency action. Moreover, Daniel established in the beginning of these proceedings that he is willing to do what is necessary to gain custody of D.G.C.

{¶49} It is also clear from the record that Daniel was considered a possible placement for D.G.C. in lieu of temporary custody being awarded to the Agency.

Consequently, it was imperative for the trial court to consider evidence of the condition of Daniel's home in order to assess whether Daniel was a viable option for D.G.C.'s placement. Therefore, we find Jamie's argument that the trial court should not have permitted the Agency to introduce evidence of the condition of Daniel's home is without merit. Jamie's fifth assignment of error is overruled.

{¶50} For all these reasons, the judgment of the Defiance County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**PRESTON, J., concurs.**

**/jlr**

**WILLAMOWSKI, J., dissents.**

{¶51} I dissent from the majority opinion and would reverse the judgment in this case based upon the third assignment of error. In the third assignment of error, Jamie alleges that the trial court's finding of dependency was against the manifest weight of the evidence.

> **Before a juvenile court may enter a finding of abuse or dependency, the state has the burden of establishing by clear and convincing evidence that a child is abused or [dependent]. * * * "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required beyond a reasonable doubt, in criminal cases, and which will**

-24-

> **produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."** *Cross v. Ledford* **(1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus.**

*In re. C.B.*, 12th Dist. Nos. CA2008-01-0002, CA2008-01-003, 2008-Ohio-5543, ¶10. "A dependency adjudication focuses not on the fault of the parents, but on 'the child's environment, including the condition of the home itself and the availability of medical care and other necessities.'" *In re V.R.*, 9th Dist. No. 23527, 2008-Ohio-1457, ¶17 (quoting *In re T.W.*, 9th Dist. No. 2381, 2008-Ohio-109, ¶11). To meet the burden of proof for a dependency finding, the Agency must present clear and convincing evidence of conditions that adversely affect the normal development of the child. Id. In this case, the complaint alleged that DGC was a dependent child pursuant to R.C. 2105.04(C), which defines a dependent child as one whose "condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." R.C. 2105.04(C).

> **Such an adjudication should concentrate on whether the [child is] receiving proper care and support and look to environmental elements that are adverse to the normal developments of children. * * * The focus should be on the child's condition and environment, not on the fault of the parent. * * * The conduct of the parent is relevant only insofar as it forms a part of the [child's] environment and it is significant only if it has a detrimental impact on them. * * * "That impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner."**

*In re D.H., A.H., S.B., D.Q.,* 9th Dist. No. 25095, 2010-Ohio-2998, ¶5 (quoting *In re Burrell* (1979), 58 Ohio St.2d 37, 39, 388 N.E.2d 738, other citations omitted).

**{¶52}** The evidence indicated that on or about February 3, 2010, Jamie was living with Michael, her son, and her former mother-in-law in Paulding County. She testified that after she was asked to leave the home where she was living with Daniel and Tina, she made arrangements to stay with Michael until she found a new place to live.[2] Jamie testified that she had a good relationship with Michael and that they had a successful shared parenting agreement for their son. The Agency had never visited this home to determine whether the environment to which DGC would be going was appropriate.[3] At the time indicated in the complaint, DGC was still in the hospital where he was born healthy and drug free. All of his needs were being met. The Agency did not present any evidence that indicated that DGC was not receiving proper care and support or that he was adversely affected by anything Jamie had done. To the contrary, Jamie testified that she had been receiving prenatal care and that she had scheduled the birth at the hospital. She testified that she had made arrangements for a place to live and had a support system in place with other people living in the home where she was staying. Since the Agency did not even attempt to visit DGC's home or speak

---

[2] Soon afterwards, Jamie found an apartment in Paulding County where she lived at the time of the hearing.
[3] The Agency did conduct a home visit to Daniel's, but that is not relevant as Jamie was not living there. As residential parent, Jamie's residence determines DGC's residence.

with anyone in the home, it was unable to present any evidence that would indicate that the environment to which DGC would be going was improper in any way. Jamie did admit that she was considering moving away from Ohio. However this is not a valid basis for a finding of dependency. Likewise, the alleged attempted sale of the vicodin tablets by shipping them to Florida was not shown to have any adverse effect on DGC, especially since testimony was provided that no charges resulted from the incident.

{¶53} The Agency argues that since Jamie had previously had her parental rights terminated, she could not possibly be a good parent now. Thus, the Agency claims that the removal of DGC from the hospital was necessary. Although it is permissible to remove a child from the hospital as a dependent, it requires that the Agency show that the condition to which the child would go would be threatening to the health and safety of the child. *In re Campbell* (1983), 13 Ohio App.3d 34, 468 N.E.2d 93. That was not the case here. The home to which DGC would be going was already the home of another child. No evidence was presented that there were any concerns about this home by Paulding County Department of Job and Family Services. Since the Agency did not visit the home, it could not present any evidence on the suitability. Basically, the Agency presented a case of prior issues with parenting, a transitional home, and the possibility that Jamie might leave the state, as the basis for removing her child as a dependent child. This

evidence did not clearly and convincingly prove that DGC was in any danger of not having his needs met at the time indicated in the complaint. Additionally, the Agency failed to show how Jamie's actions had an adverse effect on DGC. For these reasons, I would sustain the third assignment of error.

{¶54} The majority focuses on the prior dependency rulings to support the trial court's judgment. However, those prior findings were not recent in time and the circumstances had changed from the prior proceedings. The Agency presented no evidence as to the current environment, only that from several years prior. While a different section of the statute provides for an agency to move for temporary custody on the grounds that prior children have been found dependent, the Agency in this case chose not to proceed under that section of the statute and instead brought the case under the section requiring the environment to be harmful. The mere fact that the Agency could have proven its case if it had chosen to proceed under a section it chose not to pursue does not mean that it then succeeds under the section it chose to pursue. The Agency had the power to choose the statutory section or to amend the complaint at any time to include the other section. At oral argument, the Agency admitted that they could have but did not do so. The evidence does not support the claim made by the Agency. The position of this court is similar to that of an umpire in baseball. If a pitcher chooses to throw a curve ball and misses the plate, the umpire does not call it a

strike merely because it would have been one if the pitcher had thrown a fast ball. The umpire is required to rule on the pitch as made, not how it could have been. This court likewise must rule on the case before us, not search for ways to save the Agency's case. The Agency failed to prove what it was required to prove: that the environment to which DGC would return was not safe. The Agency failed to set forth any evidence as to the environment to which DGC would be going, but instead relied upon the testimony of a caseworker that had not seen Jamie in years. The Agency missed the plate. Instead of doing the job of the Agency and making bad law in the process, I would hold them to their burden of proving the claim set forth in the complaint. Thus, I would reverse on the third assignment of error.